**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| GREG CIMA, DIANA PEEK, LINDA McMAHON, MIKE BEARD, SHARON BEARD, JOHN BECKWITH, Jr., and STEPHEN JELLEN, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>      v.<br><br>WELLPOINT HEALTHCARE NETWORKS, Inc., UNICARE NATIONAL HEALTHCARE SERVICES, Inc., UNICARE ILLINOIS SERVICES, Inc., UNICARE HEALTH INSURANCE COMPANY OF THE MIDWEST, RIGHTCHOICE MANAGED CARE, Inc., and RIGHTCHOICE INSURANCE COMPANY,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Case No. 05-cv-4127-JPG |

**MEMORANDUM AND ORDER**

**GILBERT, District Judge:**

      This matter is before the Court on WellPoint Health Networks, Inc. (Wellpoint), UniCare

Illinois Services, Inc. (Illinois Services), RightCHOICE Managed Care, Inc. (Missouri Care),

UniCare National Services, Inc. (Unicare National) and RightCHOICE Insurance Company's

(Rightchoice) motion to dismiss (Doc. 13) and supporting memorandum of law (Doc. 14). UniCare

Health Insurance Company of the Midwest (Midwest) has also filed a motion to dismiss (Doc 26)

and a supporting memorandum (Doc. 27). Plaintiffs filed a combined response to these motions

(Doc. 71), to which defendants filed a combined reply (Doc. 84). For the following reasons, the

Court will **GRANT IN PART AND DENY IN PART** defendants' motions.

-1-

## BACKGROUND

### I.      Procedural History

Greg Cima, Diana Peek and Linda McMahon filed this action in Illinois state court against Wellpoint and Illinois Services in March 2003.  Cima, Peek and McMahon, joined by Mike Beard, Sharon Beard, John Beckwith, Jr. and Stephen Jellen (plaintiffs), filed an amended complaint on June 3, 2005, in which they named four additional defendants: Missouri Care, Unicare National, Rightchoice, and Midwest.  Defendants timely removed this action pursuant to the Class Action Fairness Act of 2005, Pub.L. 109-2, 119 Stat. 4 (2005). *See* 28 U.S.C. § 1332.  On February 3, 2006, this Court denied plaintiffs' motion to remand.  (Doc. 58).  In this order, the Court found that plaintiffs sued defendants on behalf of a nationwide class of Wellpoint (and its subsidiaries) policyholders.  (Doc. 58 at 19).

### II.     Factual Background[1]

Over the last decade, Wellpoint[2] has expanded its business by acquiring various regional health insurance providers throughout the United States.  One of the companies it acquired was Missouri Care, and its Illinois subsidiary, Rightchoice.  Plaintiffs allege Wellpoint acquired Missouri Care intending – contrary to its representations to Illinois regulatory authorities – to cause

---

[1]The Court draws the facts from plaintiffs' well-pleaded allegations in the complaint.

[2] In the early nineties, the insurance industry in the United States consisted mainly of not-for-profit companies licensed by the Blue Cross Blue Shield Association.  The Association granted companies the exclusive right to use the Blue Cross name in a particular state.  In the mid-nineties, many insurance companies changed to for-profit status and began to operate on a larger scale.  One such entity was the Blue Cross licensee in California, Blue Cross California. In 1996, Blue Cross California reincorporated to form a for-profit entity, defendant Wellpoint. Wellpoint is an Illinois corporation with its principal place of business in California.  It began doing business in Illinois in 1996 through its subsidiaries.

Rightchoice to withdraw from the Illinois market so it could reap the benefits of Missouri Care's operation without having to carry the burden of Rightchoice, which was unprofitable.   After Wellpoint acquired Missouri Care, it caused Rightchoice to withdraw from the Illinois market and forced Rightchoice's policyholders to convert their policies to Unicare policies (the brand name of the policies offered by Wellpoint's subsidiaries in Illinois) or secure insurance elsewhere.  Plaintiffs claim Wellpoint used the merger to circumvent certain restrictions in the Illinois Insurance Code.

Wellpoint is the parent company of all defendants here: Unicare National is the parent company of Illinois Services, which, in turn, is the parent company of Midwest, and Missouri Care continues to be the parent corporation of Rightchoice.  Missouri Care services approximately 2.8 million individuals as the Blue Cross Licensee in Missouri.  Rightchoice, which operated only in Illinois, serviced approximately 300,000 Illinoisans – Rightchoice was not a Blue Cross licensee.

In late 2001, Wellpoint and Missouri Care agreed to merge.  Before finalizing the transaction, Wellpoint had to gain regulatory approval from the Illinois Division of Insurance (IDOI).  In one of its filings with the IDOI, Wellpoint represented it had

> no plans to make any other material change in [Missouri Care's], [Rightchoice] or any other Acquired Subsidiary's business operation or corporate structure, other than as may be provided herein or as may arise in the ordinary course of business, and other than to achieve the synergies that normally arise in substantial acquisitions.

(Doc. 2  ¶ 35).  With Illinois regulatory approval, the companies effected a triangular merger on January 31, 2002.  Missouri Care emerged from the transaction a wholly-owned Wellpoint subsidiary.[3]

_____

[3]Wellpoint similarly acquired portions of the Massachusetts Mutual Life Insurance Company and the John Hancock Mutual Life Insurance Company.  It acquired Rush Prudential

Mark Gastineau (Gastineau) was Wellpoint's "point-man" on the withdrawal and conversion.[4] He had the responsibility of shepherding the transaction and organizing its particulars. Jay Naftzger (Naftzger), a Unicare Vice President, and Gastineau met with IDOI representatives on May 23, 2002 to discuss the merger. In this meeting, Naftzger and Gastineau informed IDOI officials of the specifics of Wellpoint's plans for the withdrawal. Naftzger sent a letter to IDOI officials on May 31, 2002 memorializing the meeting, in which he outlined the specifics of the withdrawal (discussed in detail in the meeting) and indicated his belief that Wellpoint had IDOI's approval for the withdrawal and conversion.[5] Rightchoice notified its policyholders in June 2002 (by letter) that it planned to withdraw from the market on January 1, 2003, thereby giving them the 180 days' notice required under 215 ILCS 97/50. (Doc. 2 Ex. 17). In this letter, Rightchoice outlined the options available to its policyholders: they could 1) continue their current policies with an automatic conversion to a Unicare policy (with an accompanying 250% increase in premium payments); 2) reapply for a new Unicare policy, subject to underwriting; or, 3) seek coverage elsewhere. (Doc. 2 ¶42). Forcing the Rightchoice policyholders to be underwritten again caused the premiums of the ill and infirm among them to increase significantly.

When an insurance company underwrites an individual, it decides whether to accept the individual as a policyholder and issue a policy, to decline to do so, or to issue a policy subject to

---

Health Plans of Illinois (Rush Prudential), PrecisionRx, Cerulean Companies, Inc., MethodistCare, Inc., Cobalt Corporation and Golden West Dental and Vision entirely.

[4] In what capacity Gastineau served is unclear.

[5] In a subsequent newsletter to insurance brokers, Wellpoint represented that it had "obtained approval from the [IDOI] to withdraw RightCHOICE plans from the market . . . ." (Doc. 2 ¶69). Plaintiffs claim that the IDOI does not "approve" withdrawals and that this letter was intentionally misleading.

certain conditions (relating to, among other things and where acceptable, pre-existing medical conditions). If the insurance company decides to issue a policy, it then sets an individual's premium based on a number of factors. As insurance companies generally do not underwrite their insureds additional times, their premiums do not change as a result of poor health.[6] State and federal law also generally prohibit insurance companies from failing to renew their customers' policies when they become ill. Here, Unicare rerated all the Rightchoice policyholders who chose to accept options one or two; it either increased their premiums 250% or calculated their new premiums according to their health status at the time of rerating. This occurred even though Rightchoice factored in the cost of their deteriorating health when it set their original premiums. As Wellpoint owned both Unicare/Midwest and Rightchoice, plaintiffs claim their insurance company never really withdrew from the Illinois market and impermissibly discriminated against them based on their health status.

To summarize, plaintiffs allege Wellpoint merged with Missouri Care intending to use the merger (and its potential synergies) as an artifice by which it could "legally" deny coverage or rerate the premiums of the Rightchoice policyholders. Plaintiffs claim defendants used the merger to circumvent certain provisions in the Illinois Insurance Code and that in the course of doing so, they made a number of fraudulent representations, which the Court will detail, as necessary, below. Plaintiffs set forth six claims for relief in the complaint: Counts I and II for violations of the Illinois Insurance Code, Count III for breach of contract, Count IV for violations of the Consumer Fraud and Deceptive Trade Practices Act, Count V for common law fraud, and Count VI for breach of defendants' duties of good faith and fair dealing.

---

[6] Insurance companies are allowed to make some changes to premiums if they apply equally to all insureds. Premiums can change as a result of an insured's age as well.

## ANALYSIS

Defendants have moved for dismissal of all plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6). When reviewing such a motion, a court must accept all allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Moranski v. General Motors Corp.*, 433 F.3d 537, 539 (7th Cir. 2005); *Holman v. Indiana*, 211 F.3d 399, 402 (7th Cir. 2000). A court should not grant a Rule 12(b)(6) motion unless it appears beyond doubt that the plaintiff cannot prove his claims under any set of facts consistent with the complaint. *McDonald v. Household Intern., Inc.*, 425 F.3d 424, 428 (7th Cir. 2005).

A complaint is sufficient so long as it pleads "the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer." *Higgs v. Carver,* 286 F.3d 437, 439 (7th Cir. 2002). Nevertheless, a plaintiff can plead himself out of court by pleading facts that demonstrate he is not entitled to relief. *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992). In their motions to dismiss, defendants refer extensively to a number of facts not pleaded in the complaint. Ordinarily, when a party presents such material in connection with a 12(b)(6) motion, the Court may not consider it unless it converts the motion to one for summary judgment and gives the parties fair warning and an opportunity to respond. This general rule does not apply here because defendants refer exclusively to the exhibits plaintiffs attached[7] to the complaint. *See Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002). Therefore, the Court will consider plaintiffs' exhibits without converting defendants' motions.

### I.      Illinois HIPAA, Counts I and II

---

[7] This litigation has been pending for a number of years. Therefore the record, consisting of plaintiffs' 46-page complaint and over 500 pages of exhibits, is similar to the record on summary judgment.

The parties agree that the Illinois Health Insurance Portability and Accountability Act (Illinois HIPAA), 215 ILCS 97/1-97/50, does not contain an explicit private right of action.  They disagree whether a private right of action is properly implied.  Judge Timberlake (the state court judge) addressed this issue in a ruling he made prior to defendants' removal of this action.  (Doc. 71 Ex. 1).  Therefore, before addressing this issue, the Court must determine whether his ruling is the law of the case.

### A.      Law of the Case

In Judge Timberlake's May 3, 2005 Order dismissing the first five Counts of the complaint without prejudice, he made the following statement: "Defendants argue that there is no private right of action occasioned by [Illinois HIPAA] or the Insurance Code of Illinois . . . .  The very name of the act in question and the factual situation pleaded by Plaintiff [sic] controverts Defendants' assertion." (Doc. 71 Ex. 1 at 1).  Judge Timberlake plainly held that a private right of action exists under Illinois HIPAA, but the record does not disclose how he came to this determination.

Judge Timberlake's ruling stands unless modified by this Court. 28 U.S.C. § 1450; *Payne v. Churchlich*, 161 F.3d 1030, 1037 (7th Cir. 1998).  The Court must accept this holding under the doctrine of law of the case in the absence of extraordinary circumstances.[8]  *See Payne*, 161 F.3d at 1037 n.8 (citing *Arizona v. California*, 460 U.S. at 618).[9]  Though its application is discretionary, *Bagola v. Kindt*, 131 F.3d 632, 637 (7th Cir. 1997), a court "should be loathe to [revisit prior

---

[8] Simply stated, the doctrine provides, "[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." *See Payne*, 161 F.3d at 1037 n.8 (citing *Arizona v. California*, 460 U.S. 605, 618 (1983)).

[9] The doctrine applies equally to decisions made by a state court prior to removal.  *Payne*, 161 F.3d at 1037 n.8 (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)).

decisions of a coordinate branch] in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." *Payne*, 161 F.3d at 1037 n.8 (citations and internal quotations omitted).  The doctrine is only applicable to an issue that a court considered and decided, *Int'l Union of Operating Eng'rs, Local Union 103, v. Indiana Const. Corp.*, 13 F.3d 253, 256 (7th Cir. 1994); *see also* 18B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 4478 (2d ed. 2002), and does not apply to dicta.  *Geldermann, Inc. v. Fin. Mgmt. Consultants, Inc.*, 27 F.3d 307, 312 (7th Cir. 1994).  Judge Timberlake dismissed the complaint for plaintiffs' failure to plead with sufficient detail under Illinois pleading standards, which are irrelevant here. (Doc. 58 at 24).  This independent ground supporting his ruling arguably makes his holding on the existence of a private right of action dicta.  In any event, defendants have offered arguments in their briefs, which would, if accepted, make Timberlake's ruling clearly erroneous.  Given the lack of analysis on this issue in his Order and the reasons just stated, the Court will make an independent determination on the existence of a private right under Illinois HIPAA.

### B.     Private Right of Action under Illinois HIPAA

A court should give effect to the intention of the legislature when determining whether a statute creates a private right of action; "all other rules of statutory construction are subordinated to this cardinal principle."  *Metzger v. DaRosa*, 805 N.E.2d 1165, 1167 (Ill. 2004).  Though the best way to determine the legislature's intent is to look at the statute, *id.*, the absence of an explicit grant of a private right does not mean that none exists, for Illinois courts may, and often do, find private rights of action implied in Illinois statutes. *Fisher v. Lexington Health Care, Inc.*, 722 N.E.2d 1115, 1117 (Ill. 1999).  A private right is properly implied if

> (1) the plaintiff is a member of the class for whose benefit the statute was enacted;
> (2) the plaintiff's injury is one the statute was designed to prevent; (3) a private right

> of action is consistent with the underlying purpose of the statute; and (4) implying a private right of action is necessary to provide an adequate remedy for violations of the statute.

*Id*. at 1117-18.  When analyzing these factors, a court should consider the statute as a whole, and not as isolated provisions.  *Id.* at 1119.  The Supreme Court of Illinois has directed courts to focus on the fourth factor and has repeatedly held that a court should not find a private right of action implied in a statute unless it would be ineffective without one.  *See, e.g., Abbasi ex rel. Abbasi v. Paraskevoulakos*, 718 N.E.2d 181, 185, 186 (Ill. 1999); *Fisher*, 722 N.E.2d at 1120.

Illinois adopted its version of HIPAA in 1997.  *See* P.A. 90-30, S.B. 802 (1997).  The parties have cited to no cases citing to or interpreting the Act, and the Court's own research has disclosed only one state case containing a citation to Illinois HIPAA, *Molnar v. Conseco Med. Ins. Co.*, 830 N.E.2d 800 (Ill. App. Ct. 1st Dist. 2005), and one federal case, *In re Health Mgmt. Ltd. P'Ship*, 303. B.R. 162 (Bankr. C.D. Ill. 2003), both of which are irrelevant.  The Act itself contains no provision which explicitly details the purposes for which it was passed.  Therefore, the Court will look to the plain language of its provisions when applying the four-factor test set forth in *Fisher*.

### i.    Factor One

Plaintiffs claim they are members of the class for whose benefit the statute was enacted.  They ground this assertion in three provisions of the Act: 215 ILCS 97/20, which limits policy exclusions for preexisting conditions, 215 ILCS 97/25, which forbids discrimination regarding eligibility (including continued eligibility) based on the individual's health status or claims experience, and 215 ILCS 97/50, which requires insurers to renew individuals' policies at their option.  Plaintiffs' believe the practical effect of defendants' scheme is just the sort of discrimination these provisions were meant to prohibit and that defendants attempted to circumvent these

provisions using the merger and a strict interpretation of Illinois HIPAA to justify their actions. Clearly, the Act includes provisions which are meant to protect policyholders from losing their coverage as a result of deteriorating health.  It requires no great leap to imagine Wellpoint forced the conversion and subsequent rerating so that it would not have to carry the burden, through Unicare, of Righchoice's expensive (*i.e.*, sick and old) insureds. Given the lens through which the Court must view plaintiffs' complaint, the Court has no trouble finding that plaintiffs are members of the class the Act was meant to protect.

To counter these assertions, defendants seize upon, like several Illinois appellate courts, one phrase from the Supreme Court of Illinois' opinion in *Sawyer Realty Group, Inc. v. Jarvis Corp.*, 432 N.E.2d 849 (Ill. 1982).  There, the Court held, "when a statute is enacted to protect *a particular class of individuals*, courts may imply a private cause of action for a violation of that statute although no express remedy has been provided."  *Sawyer Realty Group*, 432 N.E.2d at 852 (emphasis added).  Several appellate courts have cited *Sawyer Realty Group* for the proposition that a court should not recognize an implied right of action when the legislature intended the statute at issue to benefit the public generally, rather than an identified, distinct segment of the population. *See, e.g., Am. Fed'n of State, County & Mun. Employees, Council 31 v. Ryan*, 807 N.E.2d 1235, 1241 (Ill. App. Ct. 5th Dist. 2004) ("Where a statute is intended to benefit the public at large, rather than a particular segment of the population, courts do not recognize an implicit legislative intent to create a private right of action."); *Moore v. Lumpkin*, 630 N.E.2d 982, 990 (Ill. App. Ct. 1st Dist. 1994) (same).

It is important that the intermediate appellate courts rendered both of the decisions cited by defendants.  In a diversity action, in the absence of authority on point from the state supreme court,

it is the duty of the district court to "make a predictive judgment as to how the supreme court of the state would decide the matter if it were presented presently to that tribunal." *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 635 (7th Cir. 2002).  This admonition does not change the duty of district courts "to give great weight" to the holdings of the appellate courts; they should only deviate from those decisions when there are "persuasive indications that the highest court of the state would decide the case differently from the decision of the intermediate appellate court." *Id*. at 637.

The Supreme Court of Illinois has not explicitly addressed this issue.  It did, however, implicitly reject this principal in *Corgan v. Muehling*, 574 N.E.2d 602 (Ill. 1991).  There, the Supreme Court addressed whether an implied private right of action existed under the Psychologist Registration Act, Ill.Rev.Stat.1981, ch. 111, par. 5301 *et seq*.  *Corgan*, 574 N.E.2d at 609.[10]  The Court found that the Act created a private right.  Because it "was enacted to protect the public by prohibiting individuals from practicing . . . psychology without a valid certificate of registration" and the plaintiff was "certainly a member of the public[,]" she was a member of the class for whose benefit the Act was enacted.  *Id*.  This analysis clearly conflicts with *Ryan* and *Moore*.

The Court must also account for the differences between Illinois and Federal law in this area. In *Sawyer Realty Group*, the Supreme Court of Illinois noted, "[w]hile the United States Supreme

---

[10] The Court addressed the following provision in the Act:

It is hereby declared to be a public nuisance for any person to represent himself as a psychologist or that the services he renders are psychological services without having in effect a currently valid certificate as defined in this Act. The Director or the State's attorney of the county in which such nuisance has occurred may file a complaint in the circuit court in the name of the people of the State of Illinois perpetually to enjoin such person from performing such unlawful acts.

*Corgan*, 574 N.E.2d at 609 (quoting  Ill.Rev.Stat.1981, ch. 111, par. 5327).

Court has become increasingly reluctant, in construing Federal legislation, to read a private remedy into an act . . . [Illinois] courts have continually demonstrated a willingness to imply a private remedy, where there exists a clear need to effectuate the purpose of an act." 432 N.E.2d at 853. *Moore* was based, in large part, upon the decisions of the federal courts.  630 N.E.2d at 990 (citing *Cort v. Ash*, 422 U.S. 66, 78 (1975)).  Given the Supreme Court of Illinois's willingness to imply a private right when a statute would be ineffective without one, *Metzger*, 805 N.E.2d at 1168, *Fisher*, 722 N.E.2d at 1117-20, *Abbasi*, 718 N.E.2d at 185, 186, *Sawyer Realty Group, Inc.*, 432 N.E.2d at 853, it is unlikely that it would apply this restriction today.  Therefore, the Court declines to apply the limitation expressed in *Moore* and *Ryan*.

### ii.      Second Prong

Defendants claim plaintiffs' injuries are not the type the legislature intended  HIPAA to prevent.  Primarily, they claim HIPAA could not have been intended to address the wrongs suffered by the plaintiffs because they complied with its provisions on market withdrawal. They also point out that an insurance company has no obligation under Illinois law to provide subsequent coverage to, or to facilitate new coverage for, those who lose their insurance as a result of a market withdrawal.

Defendants have failed to take account of the broader scope of plaintiffs' allegations. Plaintiffs allege that defendants used the merger to circumvent the restrictions in HIPAA to rerate or get rid of the ill and infirm based on their health status and that they misrepresented their intentions to Illinois regulatory authorities to gain approval for the merger.  This is exactly what HIPAA seeks to prevent, insurance companies refusing to renew coverage based upon an individual's medical condition.  *See*  215 ILCS 97/20, 97/25, 97/50.  If a provider could withdraw

-12-

from the market and reenter it the next day or next year, then the prohibitions cited above would be decidedly weak.  To give them teeth, the Act forbids an insurance company (the issuer) from reentering the Illinois market for 5 years after its withdrawal. 215 ILCS 97/30(C)(2)(b).  Plaintiffs allege that Wellpoint, through its affiliates, received the benefit of a withdrawal without the burden of waiting 5 years.  Thus, if the Court takes these allegations as true, which it must, plaintiffs have shown that their injuries are the type the legislature intended Illinois HIPAA to prevent.

### iii.    Third Prong

The implication of a private right is also consistent with the purpose of the statute.  Plaintiffs assert the purpose of HIPAA is to protect an insured's ability to renew "without regard to [her] inherently worsening health over time."  (Doc. 71 at 15 n.28 ¶2).  As previously noted, the Act ensures this by limiting exclusions for preexisting conditions, 215 ILCS 97/20, forbidding discrimination based on medical conditions for continued eligibility, 215 ILCS 97/25, and by allowing participants to renew their policies at their option, 215 ILCS 97/50.  If not an archetypal violation of the Act, plaintiffs have alleged one that is serious indeed.  If the legislature did not intend the Act to prevent the conduct alleged here, the Act includes a loophole subject to substantial exploitation.

The word "prevent" is troublesome in this context.  Courts in Illinois, like the federal courts, have drawn a distinction between statutes that are remedial in nature and those that are prohibitory or regulatory.  When a statute is remedial, it is proper for a court to give it a broad construction.  *Sawyer Realty Group*, 432 N.E.2d at 854.  When a statute is prohibitory, regulatory, or penal in nature, a strict construction is appropriate.  *See id.*; *McKey & Poague, Inc. v. Stackler*, 379 N.E.2d 1198, 1203-04 (Ill. App. Ct. 1st Dist. 1978).  Defendants claim Illinois HIPAA is not remedial in

-13-

nature and that a strict construction is appropriate, citing decisions of both the state and federal courts in Illinois.  For example, in *Emerald Pork, II, Ltd. v. Purina Mills, Inc.*, 17 F.Supp.2d 816, 817 (C.D. Ill. 1998), the court refused to recognize a private right on its conclusion that the statute at issue was regulatory in nature, not remedial.  The statute at issue was regulatory because "the Director of the Illinois Department of Agriculture [had] the authority to enforce [the] statute rather than relying upon individuals to bring suit . . . ."  *Id*.  The court also based this decision on the legislature's inclusion of criminal penalties in the act.  *Id*.

Defendants also cite *Davis v. Dunne*, 545 N.E.2d 539, 541 (Ill. Ct. App. 1st Dist. 1989) and *Asllani v. Bd. of Ed.*, 845 F.Supp. 1209, 1225 (N.D. Ill. 1993) on this point.  In *Davis*, a civil service employee attempted to assert a private right of action under the Civil Service Act for a violation of the Cook County Civil Service Commission Rules, which provided for promotion on the basis – where practical and among other things – of competitive examination, after another employee was promoted ahead of him without an examination.  *Davis*, 545 N.E.2d at 539-40.  The court found that the enumeration of three governmental agencies to conduct prosecutions for violations of the Act indicated the legislature's intention to limit the remedies provided thereunder to the criminal penalties set forth in the Act.  *Id*. at 540.  Thus, the Act was not remedial in nature.  This conclusion was bolstered by provisions of the Act itself as it merely provided procedures for the appointment, removal and promotion of civil service employees.  *Id*.

In *Asllani*, the Court held that the Illinois School Reform Act, 105 ILCS 5/34-1.01, *et seq*., did not provide a private right of action for the plaintiff.  Asllani claimed an entitlement to a civil

remedy under the Act because her school board failed to renew her contract based on her gender.[11] The court rejected her claim and refused to infer a private right because the Act was remedial and she was not one of its intended beneficiaries. *Asllani*, 845 F.Supp. at 1224.  The Court refused to find a private right in the Act for two reasons.  First, it found the legislature enacted the Act for the benefit of students, not principals. *Id.* at 1225.   Second, it found Asslani had other remedies if her claims were meritorious, namely, the Illinois Human Rights Act and Title VII. *Id*.

Seeking to support their claims under these cases, defendants direct the Court to a provision in the Illinois Insurance Code giving the Director of the IDOI the authority to enforce the Code's provisions. *See* 215 ILCS 5/401.  Under this section, the Director has the authority to "institute such actions or other lawful proceedings as he may deem necessary for the enforcement of the Illinois Insurance Code" or to request that the Attorney General do so.  215 ILCS 5/401(d). The parties do not dispute that 215 ILCS 5/401 applies to HIPAA, and under *Davis*, this is strong evidence of the legislature's intention not to create a private right.

Plaintiffs have shown, however, that the delegation in 215 ILCS 5/401 does not preclude the implication of a private right of action in all cases.  In *Casualty Insurance Company. v. Hill Mech. Group*, 753 N.E.2d 370, 378 (Ill. App. Ct. 1st Dist. 2001), the First District Appellate Court held that the Director's general enforcement power under 215 ILCS 5/401 was insufficient, in itself, to show that an administrative remedy existed to vindicate the wrongs committed by the defendant. *Id*.  The Court based this conclusion in large part on a letter from the IDOI stating that it did not enforce the specific violations plaintiffs asserted. *Id. Casualty Insurance Company* suggests that whether the

---

[11] Among other things the Act prohibited gender discrimination in the selection of school principals.

Director's enforcement power is sufficient to negate a private right is an issue that sometimes requires a factual inquiry beyond what is appropriate in a motion to dismiss. *See id*. Plaintiffs believe this is just such a case. Even if the Court were to accept this conclusion, which it is hesitant to do, it would be of little consequence given the Court's findings below.

### iv.    Fourth Prong

Plaintiffs assert that a private right is necessary to provide an adequate remedy for defendants' violations of the Act. Without such a remedy, they claim they have no other avenue to enforce their rights. The Court finds it difficult to credit this assertion in light of their arguments in support of their  Illinois Consumer Fraud Act, 815 ILCS 505/1-505/12 (CFA), breach of contract and common law fraud claims. That aside for the moment, the Court will address plaintiffs' central contention under the fourth prong of the test: that the IDOI does not monitor or police market withdrawals. First of all, it is clear that 215 ILCS 5/401 gives the Director the *authority* to do so. Although the parties dispute the nature and extent of the interaction between Wellpoint officials and IDOI officials here, there is no disputing that IDOI representatives and Wellpoint representatives discussed Wellpoint's plans for the withdrawal and conversion.

As their first exhibit to the complaint, plaintiffs attached the letter, discussed above, from Naftzger to Chuck Budinger (Budinger), a Supervising Insurance Analysis with the IDOI. (Doc. 2 Ex. 1). Naftzger set forth the salient details of the withdrawal and conversion plan in the letter, including the date Rightchoice and Unicare agreed to mail their respective letters to the Rightchoice policyholders, defendants' plans to promote Unicare services and the choices Rightchoice and Unicare planned to offer. (*See id*.). In the last sentence of the letter, Naftzger made the following statement: "We believe we have the Department's approval to proceed as set forth in this letter. If

that is incorrect, please notify me as soon as possible upon your receipt and review of this letter."
(*Id*. at 3).

In his deposition, William McAndrew (McAndrew), the Assistant Deputy Director of IDOI, testified regarding the responsibilities of the IDOI and the nature of IDOI's dealings with defendants. According to McAndrew, "[IDOI] has two main functions. One is to regulate insurance companies in order to ensure they comply with Illinois law . . . the other is to assist and protect consumers in their relations with those companies as much as it pertains to the insurance code." (Doc. 2 Ex. 14 at 9). On the interactions between the IDOI and Wellpoint, McAndrew recounted a voicemail message he left for Naftzger where he told him to "Go for it" and that "we [IDOI] are good with everything[,]" referring to defendants' plans for the withdrawal and conversion. (*Id*. at 76). McAndrew testified that Wellpoint kept IDOI apprised of its plans and that when he left this voicemail with Naftzger, he intended it to mean that Wellpoint had IDOI's permission to go forward with the withdrawal and conversion. (*Id*. at 82, 217). Though plaintiffs dispute whether it is the actual policy of IDOI to approve, in the sense that its seal of approval is necessary before a withdrawal can proceed, these communications conclusively show that defendants consulted with IDOI officials and received representations from IDOI indicating that it did not have problems with defendants' plans.

Plaintiffs interpret McAndrew's testimony differently. One point upon which they are adamant, is that IDOI does not "approve" market withdrawals. They claim that the IDOI has neither the statutory authority nor an informal approval mechanism in place to do so. Plaintiffs point to several responses McAndrew gave in his deposition to support these contentions. When defendants' counsel asked him whether, "At some point you advised Mr. Naftzger that you approved the market

-17-

withdrawal strategy or process?"  McAndrew responded, "I don't know that I ever used the words 'approval.'  I think we didn't object to it, based on, again, the changes that we were recommending on how these notices were phrased." (Doc. 2 Ex. 14 at 72).  When plaintiffs' counsel asked whether the market withdrawal had IDOI approval, he answered, "I would say no."  (*Id*. at 165).  Thus, Plaintiffs claim "any tacit or affirmative approval of Defendants' actions establish that there is no administrative remedy available to the Plaintiffs."  (Doc. 71 at 15 n.28 ¶4).  This statement evidences plaintiffs' misconstrual of the law.  What plaintiffs' allegations show, when viewed favorably, is that IDOI made a mistake in its specific interpretation of HIPAA's provisions on market withdrawal as applied to this situation.  The question, one must not forget, is whether "the statute would be ineffective, as a practical matter, unless such an action were implied." *Metzger*, 805 N.E.2d at 1170 (internal quotations and citation omitted).  Plaintiffs' allegations do not show that the Act is ineffective as a whole; they do not even support the inference that there are systemic flaws in IDOI's regulation of market withdrawals.  Plaintiffs also fail to take account of an oft-repeated direction from the Supreme Court of Illinois in statutory interpretation, that a court must read a statute as a whole "and not as isolated provisions."  *Id*. at 1169.  If Wellpoint did indeed act in the manner plaintiffs have alleged, the Court is troubled that it may have taken advantage of a rather large loophole in Illinois HIPAA.  For better or worse, it is not this Court's responsibility to close it. Though the conduct plaintiffs have alleged is disturbing, there is absolutely no indication that this loophole makes the statute ineffectual.

What is more, even if the IDOI does not actually give its stamp of approval to market withdrawals, it is clear that some system of informal regulation is in place. The very fact that IDOI informally polices withdrawals, as is conclusively demonstrated in plaintiffs' exhibits, shows that

insurers have an incentive (though perhaps slight) to comply with HIPAA's provisions.  This incentive strongly suggests that the Act is not functionally ineffective.  *See Metzger*, 805 N.E.2d at 1171.  As *Metzger* demonstrates, the inquiry must not focus only on plaintiffs' specific claims, but on the effectiveness of the statute generally.  *See id*.  Plaintiffs' allegations in the complaint are insufficient in this regard.  Without any colorable allegation that the statute as a whole is ineffective, the Court finds plaintiffs have not met the fourth prong of the test.[12]

The Court's conclusion under the fourth prong is supported by its determinations below. As the cases cited above demonstrate, a court should look to whether a plaintiff has an alternate remedy to pursue his  claims when deciding whether an act creates a private right of action.  *See, e.g., Corgan*, 574 N.E.2d at 610; *Asllani*, 845 F.Supp. at 1225.  As the Court will explain below, plaintiffs have alternate avenues to vindicate their rights, including an actionable claim for breach of contract and an actionable claim for unfair conduct under the CFA.[13]  In the final analysis, the Court cannot

---

[12] Defendants argue that federal HIPAA, which gives federal agencies the power to enforce its provisions, provides another avenue to vindicate the wrongs of which plaintiffs complain.  Whether federal authorities in fact police this type of violation is unclear from the briefs and record before the Court. Thus, the Court cannot give much weight to this argument.

Defendants also point out that the federal courts have refused to read into federal HIPAA a private right of action.  Even though Illinois HIPAA is based on its federal counterpart, that the federal courts have chosen to take a more restrictive approach on this issue does not foreclose the implication of a right under state law. *Sawyer Realty Group, Inc.*, 432 N.E.2d at 853.

[13] On this point, plaintiffs also direct the Court to *Haft v. Charter Oak Fire Ins. Co.*, 635 N.E.2d 843, 844 (Ill. App. Ct. 1st Dist. 1994), a case where the court found a private right of action in the Illinois Insurance Code for an insurer's failure to notify its insured regarding the impending cancellation of his policy.  The court came to this conclusion with relatively little analysis.  In *Haft*, the court did not discuss the Director's enforcement power or consider any evidence regarding the IDOI's involvement with policing the type of violation at issue there. Here, the defendants have presented this argument to the Court, and have cited to exhibits demonstrating IDOI's involvement in the withdrawal, making the present case distinguishable from *Haft*.

conclude that the implication of a private right is necessary to effectuate the Act.  Under the Code, the Director has the explicit authority to compel compliance with the Code's provisions – by herself, or through the Attorney General.  Even if the IDOI improvidently gave its blessing (formally or informally) to the conversion and withdrawal here, this has little bearing on effectiveness of the entire Act.  Accordingly, the Court need not decide whether defendants complied with HIPAA here. The Court **GRANTS** defendants' motions on Counts I and II.

## II.    Breach of Contract Claim

Defendants maintain the dismissal of plaintiffs' breach of contract claim is necessary for three reasons.  First, all defendants other than Rightchoice claim that plaintiffs cannot maintain a breach of contract claim against them because they only had contracts with Rightchoice. For its part, Rightchoice contends its withdrawal from the Illinois market was appropriate under the terms of plaintiffs' policies.  Finally, defendants claim plaintiffs' allegations of breach are conclusory.

### A.    Pleading Defects and the Claim against Defendant Rightchoice

To plead the breach of an insurance contract, a plaintiff must identify the terms of the policy he alleges the defendant breached.  *Palda v. General Dynamics Corp.*, 47 F.3d 872, 874-75 (7th Cir. 1995).  In the complaint, plaintiffs allege, "Defendants owed duties and obligations to Plaintiffs and members of the class under the Subject Policies at issue, among others, to renew and not discontinue the policies except as allowed under the terms of the Subject Policies." (Doc. 2 ¶ 168).  They go on to allege that "Defendants materially breached the terms and provisions of the subject policies . . . when it [sic] discontinued Plaintiffs' insurance with RightCHOICE and gave notice that the RightCHOICE plans will no longer be available shortly after and as a result of the merger of RightCHOICE and WellPoint . . . ." (*Id.* ¶169).  Defendants characterize these allegations as

conclusory, and insufficient as a matter of law.  *See Palda*, 47 F.3d at 874-75.

Plaintiffs have identified the provisions of the policies they claim defendants breached. (Doc. 2 ¶¶ 89, 91-95)  Among others, they allege defendants breached the contract provisions incorporating provisions of Illinois HIPAA on renewability. (*Id.* ¶¶ 92, 94)  Thus, plaintiffs have pleaded the breach in more than a conclusory fashion.  Whether Rightchoice breached the contract is a question of fact.  *Arrow Master, Inc. v. Unique Forming Ltd.*, 12 F.3d 709, 714 (7th Cir. 1993); *Israel v. Nat'l Canada Corp.*, 658 N.E.2d 1184, 1190 (Ill. App. Ct. 1st Dist. 1995).  The extent to which plaintiffs can put forth evidence to support this claim is better left for summary judgment.

### B.    Breach of Contract by the other Defendants

As a general rule, one who is not a party to a contract cannot be held liable for its breach. *Gallagher Corp. v. Russ*, 721 N.E.2d 605, 612 (Ill. App. Ct. 1st Dist. 1999).  Though admittedly not parties to the contracts at issue here, plaintiffs claim the other defendants are liable for breach as Rightchoice's successors.  *See* 215 ILCS 5/166; 805 ILCS 5/11.50(a)(5); *Gray v. Mundelein Coll.*, 695 N.E.2d 1379, 1388 (Ill. App. Ct. 1st Dist. 1998).  Defendants retort by claiming the mechanics of the merger preclude the imposition of successor liability.

 Wellpoint created a wholly-owned subsidiary, RWP Acquisition Corp. (RWP), solely for purposes of the merger.  (Doc. 2 Ex. 7 at 1).  Wellpoint caused RWP to merge with Missouri Care and under the terms of merger agreement, Missouri Care emerged as the surviving corporation.  In this way, Missouri Care became a wholly-owned subsidiary of Wellpoint.  (*Id.*).  Because this was a triangular merger, with Rightchoice remaining a wholly-owned subsidiary of Missouri Care, Wellpoint and the other defendants claim they never succeeded to Rightchoice's obligations.  (Doc. 84 at 14). Defendants argue the Court must respect the form of the merger and recognize that

Missouri Care and RWP were the only parties to the merger.

Under Illinois law, the "several corporations parties to the plan of merger or consolidation shall be a single corporation, which, in the case of the merger, is that corporation designated in the plan of merger as the surviving corporation." 805 ILCS 5/11.50(1). After the merger, the separate existence of the parties to the merger cease, 805 ILCS 5/11.50(2), and the surviving corporation becomes "responsible and liable for all the liabilities and obligations of each of the corporations so merged." 805 ILCS 5/11.50(5). The Illinois Insurance Code contains similar provisions. *See* 215 ILCS 5/166(2)(b), (c). Thus, it is clear that under Illinois law, Missouri Care, the surviving corporation, succeeded to all the debts RWP and Missouri Care had incurred prior to the merger. It is equally clear that Wellpoint and Rightchoice were not parties to the merger. The parties have not, however, demonstrated to the Court's satisfaction that Illinois law applies here, considering RWP, Missouri Care and the surviving corporation were all incorporated in Delaware. (Doc. 2 Ex. 7 at 5). Under the Illinois Insurance Code, Delaware law determines the effect of the merger. *See* 215 ILCS 5/166(2)(a).

Though the Court is inclined to agree with defendants on this issue, it will not dismiss plaintiffs' breach of contract claim against the remaining defendants. First of all, defendants have failed to direct the Court to the applicable provisions of Delaware law. The Court assumes the laws of the two states are similar in this regard, but it is under no obligation to construct defendants' arguments or do their research on this score. *Spath v. Hayes Wheels Int'l-Indiana, Inc.*, 211 F.3d 392, 397 (7th Cir. 2000). Second, defendants admit that they could be liable under certain other theories. *See, e.g., Miner v. Fashion Enters., Inc.*, 794 N.E.2d 902, 911 (Ill. App. Ct. 1st Dist. 2003) ("A corporate veil will be pierced where (1) there is such unity of interest and ownership that the

separate personalities of the corporation and the individual are nonexistent, and (2) the circumstances are such that adherence to the fiction of a separate corporate existence would promote injustice or inequitable consequences."). Defendants claim plaintiffs were obligated to plead such other theories in their complaint. *See South Side Bank v. T.S.B. Corp.*, 419 N.E.2d 477, 480 (Ill. App. Ct. 1st Dist. 1981). Their citation to Illinois law for this proposition is inapposite, insofar as federal pleading rules govern the relevant inquiry. Because defendants have not directed the Court to the appropriate authorities, the Court **DENIES** their motions to dismiss as they relate to Count III.

### III.    CFA Claims

Defendants argue that plaintiffs have failed to state a claim for actionable deception or unfair conduct under the CFA. They also claim plaintiffs have failed to state a claim under the Illinois Uniform Deceptive Trade Practices Act (UDTPA), 815 ILCS 510/1-510/7. The CFA's operative provision reads as follows:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

815 ILCS 505/2 (footnotes omitted). In the complaint, plaintiffs allege defendants' actions were deceptive because they misrepresented "(a) the true reason and lawfulness of the discontinuation of the Plaintiffs' RightCHOICE polices; and (b) the true reason for the underwriting and conversion

process." (Doc. 2 ¶173). "Defendants' conduct of cancelling the insurance policy and then requiring the insureds to reapply, covert [sic] or forego coverage, violates the [CFA] as a material deceptive act or practice." (*Id*. ¶177). They also claim defendants' "policy to shed undesirable health risks by rerating and re-pricing health insurance policies by automatically converting policies, demanding reapplication, not renewing policies, or discontinuing policies is . . . unfair[,]" and that it was an "unethical pricing practice that is oppressive and unscrupulous because it was done for its own profit at the expense of the insureds causing substantial injury to these health insurance consumers." (*Id*. ¶¶ 182, 183).

Despite defendants' protestations to the contrary, plaintiffs can state a claim under the CFA for unfair practices in the absence of deceptive conduct. *See Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002); *Pappas v. Pella Corp.*, 844 N.E.2d 995, 1003 (Ill. App. Ct. 1st Dist. 2006); *Chrichton v. Golden Rule Ins. Co.*, 832 N.E.2d 843, 852 (Ill. App. Ct. 5th Dist. 2005); *Saunders v. Michigan Avenue Nat'l Bank*, 662 N.E.2d 602, 608 (Ill. App. Ct. 1st Dist. 1996); *People ex rel. Hartigan v. Knecht Services, Inc.*, 575 N.E.2d 1378, 1384-85 (Ill. App. Ct. 2d Dist. 1991); *People ex rel. Fahner v. Hedrich*, 438 N.E.2d 924, 928 (Ill. App. Ct. 2d Dist. 1982). That aside, the Court will address the legal sufficiency of plaintiffs' CFA claims.

### A.      Deceptive Conduct

To state a claim for actionable deception under the CFA, a plaintiff must prove "(1) the misrepresentation or concealment of a material fact; (2) an intent by the defendant that plaintiff rely on that misrepresentation or concealment; and (3) the deception occurred in the course of conduct involving trade or commerce." *Mackinac v. Arcadia Nat. Life Ins. Co.*, 648 N.E.2d 237, 239 (Ill. App. Ct. 1st Dist. 1995). Plaintiffs' allegations are insufficient, say defendants, because plaintiffs

-24-

based them on defendants' misrepresentations of the legality of the withdrawal and conversion plan.

*See, e.g., Capiccioni v. Brennan Naperville, Inc.*, 791 N.E.2d 553, 558 (Ill. App. Ct. 2d Dist. 2003)

("Generally, a deceptive representation or omission of law does not constitute a violation of the

[CFA] because both parties are presumed to be equally capable of knowing and interpreting the

law."); *Randels v. Best Real Estate, Inc.*, 612 N.E.2d 984, 987 (Ill. App. Ct. 2d Dist. 1993); *City of*

*Aurora v. Green*, 467 N.E.2d 610, 613 (Ill. App. Ct. 2d Dist. 1984); *Stichauf v. Cermak Rd. Realty*,

603 N.E.2d 828, 834 (Ill. App. Ct. 1st Dist. 1992).  To the extent plaintiffs base their claims on

defendants' representations of the legality of the withdrawal and conversion, their claims fail.  This

is not the end of the inquiry, however, because plaintiffs also allege that defendants made material

misrepresentations to the IDOI, that they misstated the "true reason" for the discontinuation of their

policies and misstated the "true reason" for the withdrawal and conversion.  Thus, the question

remains whether defendants' representations to the IDOI, their failure to divulge their reason for

discontinuing plaintiffs' policies, and their failure to disclose the reason for the withdrawal are

actionable under the CFA.

> ### i.   Wellpoint's Representations to the IDOI

At first blush, plaintiffs' most persuasive claim is that Wellpoint's representations to the

IDOI were fraudulent.  As detailed above, Wellpoint represented that it had no plans to make any

material changes to Rightchoice's business, other than those which might arise in the ordinary

course of business or those resulting from its desire to benefit from the potential synergies created

by the merger.  Plaintiffs have alleged that Wellpoint made this statement after it had determined

to cause Rightchoice to withdraw from the Illinois market.  Surely, withdrawing completely from

the market and discontinuing Rightchoice's business (based on the briefs and complaint, its only

business) would be a material change. There is also little doubt that this statement would qualify as a misstatement or concealment of a material fact that someone in the plaintiffs' position could reasonably rely on under the CFA.  *See Addison v. Distinctive Homes, Ltd.*, 836 N.E.2d 88, 92 (Ill. App. Ct. 1st Dist. 2005).[14]  This is not enough, however, because to establish the requisite proximate causation under the CFA, a plaintiff must also allege he was actually deceived by the statement or omission.  *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 861 (Ill. 2005).

Defendants claim plaintiffs do not have standing to premise their claims on Wellpoint's disclosure to regulatory authorities.  Whether standing is the appropriate argument here is unclear, but ultimately irrelevant, as defendants also note that plaintiffs have failed to allege they were aware of this statement.  Plaintiffs alleged defendants misrepresented the nature of IDOI's involvement in their activities to various insurance brokers in a newsletter published in September 2002, but failed to allege that the brokers communicated this information to them.  (Doc. 2 ¶69).b  As mentioned above, *Avery* requires a plaintiff to plead and prove actual deception to state a claim under the CFA in Illinois state court.  *See id.* at 861.  The question here is whether such an allegation is necessary to get past a Rule 12(b)(6) motion in federal court.

Under the Federal Rules, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake, shall be stated with particularity."  Fed. R. Civ. P. 9(b).  To comply with Rule 9(b), a plaintiff must allege the "time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations."  *Slaney v. The Intern. Amateur Athletic Fed'n*, 244 F.3d

---

[14] Though irrelevant here, it is unclear what action plaintiffs would have been aware of this representation.

580, 597 (7th Cir. 2001).  As stated in *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990), "[t]his means the who, what, when, where, and how: the first paragraph of any newspaper story."[15] Plaintiffs' failure to include any allegation that they were aware of this statement compels the conclusion that they have failed to plead their CFA claim adequately under Rule 9(b) – insofar as they base it on Wellpoint's representations to the IDOI.

> **ii.   Defendants' Failure to State, or their Misstatement of the True Reason for the Discontinuation of their Policies and the True Reason for the Withdrawal and Conversion**

Defendants also claim plaintiffs' CFA claims fail because Illinois regulatory authorities specifically authorized their actions.  The CFA does not apply to "[a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States."  815 ILCS 505/10b(1).  In *Price v. Philip Morris, Inc.*, No. 96236, 2005 WL 3434368, at *1, *32-46 (Ill. Dec. 15, 2005), the Supreme Court of Illinois conducted an exhaustive review of Section 10b(1) in relation to Phillip Morris USA, Inc.'s (PMUSA) use of terms such as "light" and "low" in describing the tar content of its cigarettes.  The court found that the Federal Trade Commission (FTC) had "specifically authorized" tobacco companies (including PMUSA) to use those (and other) terms when it entered into various consent decrees with tobacco companies regarding the use of such terms.  The decrees served as "an implicit authorization for other industry members to conduct themselves in the same manner."  *Id*. at *39.

Looking to the plain language of the statute, the court determined that two conditions must be met before a claim is barred under 10b(1).  First "a regulatory body or officer must be operating

---

[15] These requirements are meant to allow a defendant to respond to charges of fraud quickly so that he can be rid of groundless claims relatively quickly.  *Fid. Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co.*, 412 F.3d 745, 749 (7th Cir. 2005).

under statutory authority[,]" and second, the "action or transaction at issue [must be] 'specifically authorized by laws administered' by the regulatory body." *Id*. at \*32. There is no dispute with regard to the first prong here; clearly the Director of the IDOI has the statutory authority to enforce the provisions of the Illinois Insurance Code. *See* 215 ILCS 5/401. Thus, the question is whether the IDOI specifically authorized the withdrawal and conversion. If it did, 10b(1) bars plaintiffs' CFA claims regardless of their merit. *Id*. at \*34.

In the complaint and in their brief, plaintiffs claim IDOI does not approve market withdrawals; they claim withdrawals "are not subject to [IDOI's] review at all." (Doc. 2 ¶66). In the normal case, this allegation would be sufficient. *See Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998); *Am. Nurses' Ass'n v. Illinois*, 783 F.2d 716, 727 (7th Cir. 1986). However, as plaintiffs have attached hundreds of pages of exhibits to their complaint, defendants maintain plaintiffs have pleaded themselves out of court, making dismissal under 10b(1) appropriate. It bears noting at this point that 10b(1) is an affirmative defense. *Price*, 2005 WL 3434368, at \*32. Normally the existence of a meritorious affirmative defense does not justify dismissal under Rule 12(b)(6). *Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir. 2003) (noting "litigants need not try to plead around defenses."); *Deckard v. General Motors Corp.*, 307 F.3d 556, 560 (7th Cir. 2002); *Leavell v. Kieffer*, 189 F.3d 492, 494 (7th Cir. 1999). There is an exception to this general rule, however, when the validity of the defense is apparent from the complaint itself "and unmistakable, so that the suit is fairly describable as frivolous." *Walker v. Thompson*, 288 F.3d 1005, 1010 (7th Cir. 2002) ("Thus a personal-injury suit filed 100 years after the date of the injury as stated in the complaint would be frivolous, even though expiration of the time within which to sue is an affirmative defense."). With this in mind, the Court will proceed to address the applicability of 10b(1).

-28-

It is clear that defendants' compliance with Illinois HIPAA does not, by itself, entitle them to the application of 10b(1).  In *Price*, PMUSA's "mere compliance with the rules applicable to labeling and advertising [was] not sufficient to trigger the exemption created by section 10b(1)." *Price*, 2005 WL 3434368, at *32.  Under *Price*, "[c]onduct is not specifically authorized merely because it has not been specifically prohibited." *Id*.  Therefore, the inquiry under the second prong must focus on "the affirmative acts or expressions of authorization" from the regulatory body. *Id*. Such authorization may be either express or implied; it need not be pursuant to "formal agency rulemaking." *Id*. at *33.  As used in 10b(1), the term "specifically" "describes the substance or content of the authorization[,] referr[ing] to the conduct that has been authorized [not] the manner in which the authorization has been communicated." *Id*. (noting the term "'specifically' indicates a legislative intent to require a certain degree of specificity or particularity in the authorization."). The inclusion of the phrase "by laws administered by" indicates an intention to require "deference to agency policy and practice as it carries out the duties delegated to it by . . . the General Assembly" because those subject to regulation must be able to rely on the directions they receive from state authorities "without [the] risk that such reliance will expose them to tort liability." *Id*. at *33-34. The Court's inquiry with regard to plaintiffs' deception, unfairness and UDTPA claims must be separate. *See id*. at *36.

When a plaintiff bases a deceptive conduct claim on a defendant's failure to make disclosures, the defendant's "full compliance with applicable disclosure requirements is a defense, under section 10b(1), to a claim of fraud based on the failure to make additional disclosures." *Id*. (citations omitted).  However, when a claim is not based on the failure to disclose, full compliance with applicable regulations is insufficient by itself to establish the defense. *Id*.

-29-

If an insurance company ("issuer") plans to withdraw completely from the Illinois market, it must first provide 180 days' notice to the IDOI, to each plan sponsor, and to its participants and beneficiaries. 215 ILCS 97/30. Here, the parties do not dispute that defendants gave the notice required by the provision, and do not point to another provision requiring defendants to disclose anything more. (See Doc. 2 Exs. 1, 17). Thus, if plaintiffs base their deceptive conduct claim on defendants' failures to make additional disclosures, and 215 ILCS 97/30 is an "applicable disclosure requirement" under *Price*, their claim must fail. *See Price*, 2005 WL 3434368, at *36.[16] There is no indication that 215 ILCS 97/30 is not an applicable disclosure requirement.

Plaintiffs base their deceptive conduct claim on the letters Rightchoice and Midwest/Unicare sent to Rightchoice policyholders announcing the withdrawal and conversion. Fundamentally, they claim defendants should have told them that they orchestrated the withdrawal for improper and illegal reasons. Clearly, 215 ILCS 97/30 does not mandate the disclosure of the reason for a withdrawal, it only requires notice. Under that section, that defendants omitted the true reason for their plans is irrelevant. Thus, plaintiffs' deceptive conduct claim is barred by 10b(1).

There are alternative grounds to support the application of 10b(1) as well. As mentioned above, plaintiffs attached McAndrew's deposition testimony as an exhibit to the complaint. (Doc. 2 Ex. 14). His testimony demonstrates that IDOI reviewed the content of the notices defendants planned to send to the Rightchoice insureds and made various suggestions on how defendants could make them clearer. (*Id*. at 72). Even if IDOI did not approve the withdrawal (or have the authority

---

[16] As indicated *supra*, plaintiffs base their deceptive conduct claims on defendants' misrepresentation of "(a) the true reason and lawfulness of the discontinuation of the Plaintiffs' RightCHOICE polices; and (b) the true reason for the underwriting and conversion process." (Doc. 2 ¶173).

to do so) as a whole in the technical sense, it clearly approved the content of the letters.  As McAndrew stated at his deposition, the IDOI told defendants that it "didn't object to [the withdrawal], based on . . . the changes the [it] recommend[ed] on how those [letters] were phrased." (*Id*.).  Though this may not have been approval in the technical sense of the word, it certainly was the type of informal approval contemplated in *Price*.  *See Price*, 2005 WL 3434368, at *33.  *Price* directs courts to focus on the conduct the regulatory body authorized, not "the manner in which the authorization has been communicated." *Id*.  Accordingly, that the authorization here was less formal than that in *Price* is not entitled to great weight.  When looking at the content of the authorization itself, the facts set forth in the deposition transcript conclusively show that IDOI approved the letters sent to plaintiffs.  It would be unfair to hold defendants liable based on the content of these letters when the IDOI specifically reviewed them, suggested changes and then gave the go-ahead to send them.

After reviewing the complaint and the exhibits attached thereto, the Court cannot say that the validity of the 10b(1) defense is crystal clear from the face of the complaint.  *See Walker*, 288 F.3d at 1010.  However, upon careful review of the complaint and exhibits, the applicability of the defense is clear.  Under the specific circumstances presented to the Court in this case, it finds that the dismissal of plaintiffs' deceptive conduct CFA claim under 10b(1) is appropriate at this stage in the proceedings.  Therefore, the Court **GRANTS** defendants' motions in this regard.

### B.    Unfair Conduct

The Court must discuss the basis of plaintiffs' unfair conduct claim before addressing the applicability of 10b(1).  At the start, it is important to note that when deciding whether a party states a claim under the CFA, a court should give the Act a liberal construction in order to effectuate its

purpose. *Robinson*, 775 N.E.2d at 960.[17]  Whether conduct is actionably unfair under the CFA

depends upon whether it offends public policy, whether it is immoral, unethical, oppressive or

unscrupulous and whether it caused substantial injury to consumers. *Robinson*, 775 N.E.2d at 960-

61 (citing *Fed. Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972)).  For a

claim of unfairness to succeed, all three prongs of the *Sperry* test need not be met; in some instances,

the relative strength of one prong can make up for a deficiency in another.  *See id.* at 961 (adopting

the analysis of the Supreme Court of Connecticut in *Cheshire Mortg. Serv., Inc. v. Montes*, 612 A.2d

1130, 1144 (Conn. 1992)).[18]

        To determine whether conduct is unfair in the sense that it violates public policy, a court

should analyze whether it "constitutes a breach of established concepts of fairness." *Montes*, 612

A.2d at 1144.  An activity constitutes a breach of established concepts of fairness if it violates the

public policy established by statutes and the common law, *Hedrich*, 438 N.E.2d at 928, or if it falls

"within . . . the penumbra of some common-law, statutory, or other established concept of

unfairness." *Sperry*, 405 U.S. at 244.  Illinois courts also look to whether a defendant's conduct was

"so oppressive that the consumer ha[d] little alternative but to submit."  *See, e.g., Tudor v. Jewel

Food Stores, Inc.*, 681 N.E.2d 6, 8 (Ill. App. Ct. 1st Dist. 1997).

        Here, defendants' conduct was plainly against public policy.  In the first place, plaintiffs

_____

        [17] To determine whether a defendant's conduct is unfair within the contemplation of the
statute, courts may rely upon interpretations of the Federal Trade Commission Act.  815 ILCS
505/2; *Saunders*, 662 N.E.2d at 608.

        [18]Of course, it is also necessary to determine whether defendants engaged in unfair acts in
the conduct of trade or commerce. *People ex rel. Hartigan v. Knecht Servs., Inc.*, 575 N.E.2d
1378, 1384-85 (Ill. App. 2d Dist. 1991).  However, this is not an issue raised by the parties.

allege Wellpoint, through its subsidiaries, used the merger to make an end run around the renewability restrictions in Illinois HIPAA.  Thus, defendants' actions clearly violate the public policy established there.  Further, if the situation is as plaintiffs claim, Wellpoint gained regulatory approval for the merger by intentionally misrepresenting its intentions to Illinois regulatory authorities.  Surely, this goes against the spirit, if not the text of the Act as well. In a different vein, plaintiffs have included allegations sufficient to show that Rightchoice (at the direction or under the influence of Wellpoint) breached its duty of good faith and fair dealing implied in plaintiffs' insurance policies. *See J & B Steel Contractors, Inc. v. C. Iber & Sons, Inc.*, 642 N.E.2d 1215, 1222 (Ill. 1994); *In re Estate of Erickson*, 841 N.E.2d 1104 (Ill. App. Ct. 4th Dist. 2006); *Saunders*, 662 N.E.2d at 609.  Though there may not be an independent tort in Illinois for breach of that duty, *Voyles v. Sandia Mortg. Corp.*, 751 N.E.2d 1126, 1131 (Ill. 2001), certainly such a breach is within the penumbra of a common law right.

Defendants' conduct was also immoral, unethical, oppressive, and unscrupulous.  Whether or not plaintiffs have standing to premise a cause of action on Wellpoint's representations to the IDOI, if it did make them knowing it was going to cause Rightchoice to withdraw, the Court has little difficulty characterizing this action as unethical and unscrupulous.  Beyond its representations to the IDOI, Wellpoint's conscious manipulation of the requirements in Illinois HIPAA to rerate or rid itself of those most in need of health insurance is certainly immoral, oppressive, unethical and unscrupulous.

An injury is sufficient under the CFA if it is substantial, not outweighed by "any countervailing benefits to consumers or competition that the practice produces" and one which the "consumers themselves could not reasonably have avoided."  *Montes*, 612 A.2d at 1147 (quoting

letter from Federal Trade Commission to Senators Ford and Danforth (Dec. 17, 1980) (reprinted in Averitt, "The Meaning of 'Unfair Acts or Practices' in § 5 of the Federal Trade Commission Act," 70 Geo.L.J. 225, 291 [1981] ).  Here, plaintiffs have specifically alleged defendants caused them substantial injury. (Doc. 2 ¶183).  The complaint details the precise effect the withdrawal and conversion had on each of the named plaintiffs: they caused Cima, Peek, and Beckwith to pay premiums 250% more costly than before; McMahon to go without insurance; Mike Beard to go without insurance for 90 days; Sharon Beard to obtain coverage with substantially lower benefits; and Jellen to purchase a catastrophic coverage policy for 6 months and to forego his right to continuing coverage (because he is now covered by his wife's employee benefit). These allegations are sufficient to show that plaintiffs' injuries were substantial.  No countervailing benefits to consumers are apparent and plaintiffs specifically allege that defendants' activities left them with no choice but to accept the options given.  As the issuance of a new Unicare policy, or any new policy from any other insurer would require each individual to be underwritten again, it is clear they had no way to avoid the monetary costs defendants' activities caused them.[19]

The basics of the unfair conduct claim aside, the Court is left with the applicability of 10b(1). The parties heatedly dispute the extent of IDOI's involvement in the withdrawal. Again, defendants claim the IDOI approved their plans, pointing to the same evidence the Court discussed *supra*.[20]

_____

[19] Defendants claim their conduct cannot be characterized as oppressive because they gave plaintiffs the requisite notice and their policies specifically warned of the potential for a withdrawal.  *See, e.g., Saunders* 662 N.E.2d at 608-09.  Even if this is true, given the strong showing plaintiffs have made on the first two prongs, their failure to include sufficient allegations on the third prong is not dispositive.  *Robinson*, 775 N.E.2d at 961.

[20] To summarize, Wellpoint representatives met with IDOI officials; Naftzger memorialized the meeting in a letter to Budinger (Doc. 2 Ex. 1); McAndrew told Naftzger in a voicemail to "Go for it" and that "we [IDOI] are good with everything." (Doc. 2 Ex. 14 at 76);

Plaintiffs do not dispute that these communications took place, but deny that defendants had IDOI's approval in the technical sense.[21]

In *Price*, the court drew a distinction between misrepresentation claims based on the failure to disclose (barred so long as the defendant complied with applicable disclosure requirements) and those based on "active and direct" misrepresentations. *Price*, 2005 WL 3434368, at *35. When a plaintiff complains that a defendant has engaged in fraud that is active and direct, a more searching inquiry is required and a defendant's compliance with applicable regulations is not necessarily a bar to relief. *Id*. In *Price*, the court posed the following hypothetical:

> Consider, for example, if the alleged fraud was the practice of a cigarette manufacturer to put only 19 cigarettes instead of 20 in every fifth pack of cigarettes. Such a scheme would increase profits by 1% by selling 99 cigarettes instead of the 100 promised on the labels. Without a doubt, the manufacturer would be liable under the Consumer Fraud Act for the fraud, notwithstanding scrupulous compliance with all applicable rules and regulations of the FTC. Such a fraud would be "active and direct."

*Id*. at *36 (citations omitted). This is, no doubt, a recognition that a statute cannot specifically delineate every activity violative of its provisions. As plaintiffs have premised their CFA claim on defendants' unfair activities, defendants' compliance with Illinois HIPAA is not sufficient to defeat plaintiffs' claims; further analysis under the specific authorization prong of the *Price* test is necessarily fact-driven. In *Price*, the court determined that the FTC specifically authorized

---

and by leaving this voicemail McAndrew meant to convey that defendants had IDOI's permission to go forward with the withdrawal and conversion. (*Id*. at 82, 217).

[21] When asked whether IDOI approved the withdrawal he responded, "I don't know that I ever used the words 'approval.'" (Doc. 2 Ex. 14 at 72). When plaintiffs' counsel asked whether the market withdrawal had IDOI approval, he answered, "I would say no." (*Id*. at 165).

PMUSA's conduct on a fully developed factual record.[22]  Upon its review of the FTC's dealings
with the tobacco companies over the years, the court found the requisite specific authorization to
give PMUSA protection under 10b(1).

Here, defendants have not convinced the Court that the validity of this defense is
"unmistakable" or that plaintiffs' CFA claims for unfair conduct are frivolous.  *See Walker*, 288 F.3d
at 1010; *Yeksigian v. Nappi*, 900 F.2d at 104-05 (7th Cir. 1990).  Two issues remain unclear, the
extent of IDOI's authority to "authorize," in the technical sense, a withdrawal; and whether the
communications exchanged between Wellpoint and IDOI satisfy the requirements in *Price*.  Though
authorization need not be formal, the examples provided in *Price*, a Federal Reserve Board staff
interpretation, an FTC consent decree and enforcement proceeding, are certainly clearer and more
specific (if not more formal and authoritative) than a voicemail message and implicit approval
(IDOI's silence in response to  Naftzger's letter).  *See Price*, 2005 WL 3434368, at *38-40.
Therefore, the Court **DENIES** defendants' motions as they relate to plaintiffs' unfair conduct claim
under the CFA.

### C.    Plaintiffs' UDTPA Claims

Plaintiffs also premise their CFA claim on defendants' alleged violation of the UDTPA.  *See*
505 ILCS 505/2.  Defendants claim plaintiffs cannot state a claim under the UDTPA because it was
"enacted to prohibit unfair competition and was not intended to be a consumer protection statute."
*Chabraja v. Avis Rent A Car Sys., Inc.*, 549 N.E.2d 872, 876 (Ill. App. Ct. 1st Dist. 1989); *see also*
*Price*, 2005 WL 3434368, at *28.  Since the legislature intended the Act "to curtail any deceptive

---

[22]In *Price*, the trial court waited until after the trial to make its conclusions on 10b(1)
applicability. *Price*, 2005 WL 3434368, at *19.

conduct constituting unreasonable interference with another's promotion and conduct of business[,]" *Chabraja*, 549 N.E.2d at 876, defendants argue plaintiffs, who complain as consumers (not as competitors), have failed to state a claim. Plaintiffs acknowledge that the UDTPA is not a consumer protection statute, but insist that they can state a claim under the Act by alleging that defendants are harming them now and will continue to do so in the future. *See Greenberg v. United Airlines*, 563 N.E.2d 1031, 1037 (Ill. App. Ct. 1st Dist. 1990) ("Although the Act was intended to protect business people, a consumer action is permissible if the consumer can allege facts which would indicate he is 'likely to be damaged' in the future.") (internal quotations and citation omitted).

Plaintiffs ask the Court "to declare that Defendants cease charging unauthorized premiums pursuant to the new policies, and order WellPoint offer continued coverage for newly created exclusions." (Doc. 2 ¶184). In their brief, they also suggest that Wellpoint can harm them in the future by engaging in further corporate restructuring. The UDTPA provides injunctive relief, but does not allow an action for damages. *Greenberg*, 563 N.E.2d at 1036-37. Thus, so long as their injuries cannot be compensated by money damages, they can state a claim under the Act. *Id*. at 1037. Though defendants are correct that money damages should adequately compensate many of the plaintiffs, they fail to take account of plaintiffs' additional allegations: that some plaintiffs could not obtain health insurance after the conversion and that others have obtained coverage with exclusions not present in their original Rightchoice policies. (Doc. 2 ¶184). Defendants have failed to convince the Court that such injuries can be adequately compensated by monetary relief and failed to counter plaintiffs' assertion that they may suffer similar injuries in the future should Wellpoint decide to restructure its Illinois operations.

Like the other CFA claims, defendants claim IDOI's actions insulate them from liability.

The UDTPA has a provision similar to 10b(1), which removes from the Act's purview "conduct in compliance with the orders or rules or a statute administered by a . . . state . . . agency." 815 ILCS 510/4.  Under *Price*, the analysis for this exclusion at that for 10b(1). 2005 WL 3434368, at *49. Plaintiffs based their UDTPA claim on the same representations as they based their deceptive conduct claim.  For this reason, 510/4 bars plaintiffs' UDTPA claim.  Defendants' motions are **GRANTED** in this regard.

### IV.    Common Law Fraud

In the complaint, plaintiffs allege defendants wrongfully told them that they "would have to either continue with an automatic conversion policy from Unicare/WellPoint, reapply with Unicare/WellPoint for a new policy; forego coverage with WellPoint and find new coverage or, go without health insurance."  (Doc. 2 ¶186).  Plaintiffs claim these statements were false and that defendants had no grounds for believing them to be true. Defendants assert that these allegations are insufficient to state a claim for common law fraud as a matter of law because plaintiffs have based their claims on defendants' representations of legality, have failed to plead with specificity, have lumped defendants' activities together, and have failed to plead actionable fraud.

### A.    Specificity and Plaintiffs' Failure to distinguish Defendants' Activities

Defendants claim plaintiffs' failure to identify specifically the fraudulent activity that each individual defendant took necessitates the dismissal of this claim.  *See, e.g., Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1329 (7th Cir.1994).  The authorities cited by defendants suggest that broad, conclusory allegations of fraudulent activities are insufficient under Rule 9(b). When a plaintiff makes such allegations against related corporate entities, however, courts do not necessarily apply this principle so stringently.  *See id.* ("We will assume for purposes of our discussion that [the failure

-38-

to specify which defendant made a specific representation]" can be overlooked "given that the three corporate defendants in this case are related corporations that can most likely sort out their involvement without significant difficulty."). Thus, that plaintiffs may have lumped their allegations of fraud together is not necessarily dispositive.

Plaintiffs claim their citations to the letters Rightchoice and Unicare sent to policyholders satisfy the particularity requirement. The first of these letters (Doc. 2 Ex. 17), as discussed above, was from Rightchoice to its insureds notifying them of the withdrawal and their options after the withdrawal, including those with Unicare. The second letter (Doc. 2 Ex. 18), this time from Midwest, informed the Rightchoice insureds of Unicare's (Midwest's) wish to serve their insurance needs. They quote extensively from these two letters, and contend their similarity and timing, among other things, serve as proof of Wellpoint's subterfuge, of its intention to misrepresent the options open to plaintiffs. (Doc. 2 ¶73-83). These letters were on Rightchoice letterhead, they were signed and they were dated. In light of these facts, defendants cannot reasonably argue that the time, place, and manner of the alleged misrepresentations are absent from the complaint.[23] Defendants' assertion that plaintiffs failed to allege how each plaintiff was affected by the scheme is similarly unfounded. In the first place, they rely on Illinois law for this proposition, which is irrelevant. More importantly (as discussed above), the complaint details the effect of the withdrawal on the named plaintiffs. (Doc. 2 ¶¶ 96-120). Thus, the complaint is sufficient on this score.

### B.    Failure to plead Actionable Fraud

---

[23]That Wellpoint did not send these letters is of little consequence. Reading the allegations in the complaint liberally, one can reasonably view Wellpoint as a puppeteer carefully manipulating the hand of its marionette. Though its manipulation may be obscured, plaintiffs plainly allege that Wellpoint controlled the strings.

Defendants attack the substance of the fraud claim much as they have attacked the substance of plaintiffs' other claims, pointing out that Rightchoice gave plaintiffs the requisite notice and that IDOI approved the withdrawal. Moreover, they claim their failure to disclose the illegal nature of their scheme cannot serve as the basis for an action resulting from that same scheme.  Defendants have cited cases suggesting that such an attempt to bootstrap a claim is insufficient as a matter of law.  *Notaro Homes, Inc. v. Chicago Title Ins. Co.*, 722 N.E.2d 208, 217 (Ill. App. Ct. 2d Dist. 1999), *rev'd on other grounds by First Midwest Bank v. Stewart Title. Guar. Co.*, 843 N.E.2d 327 (Ill. 2006); *Charles Hester Enter. v. Illinois Founders Ins. Co.*, 499 N.E.2d 1319, 1325 (Ill. 1986); *Randels v. Best Real Estate, Inc.*, 612 N.E.2d 984, 988 (Ill. App. Ct. 2d Dist. 1993) .  These cases do not support the bootstrapping proposition, but turn on the familiar notion that a misrepresentation of law is not actionable.  Regardless, the bootstrapping argument is troubling when viewed in light of defendants' other objections.

Plaintiffs essentially premise their fraud claim on defendants' representation to the plaintiffs, in the letters cited above, that they had three choices as a result of the merger – taking the automatic conversion, applying for a new Unicare policy or getting insurance from another insurer.  Plaintiffs claim this set of choices constituted a misrepresentation because plaintiffs had a fourth choice, a contract right to the same coverage for the same premium.  Plaintiffs say they would have been aware of this choice if defendants would have disclosed the true reason for the withdrawal and conversion. At base, the underlying misrepresentation is of the legality of the withdrawal and conversion. Though plaintiffs have made an admirable attempt at convincing the Court that defendants misrepresented material facts, even giving their allegations a liberal construction, the Court finds that defendants, at most, misrepresented the legality of their actions.  As the Court has

-40-

said, misrepresentations of illegality cannot serve as the basis of a common law fraud claim. *See Green*, 467 N.E.2d at 613.  Additionally, plaintiffs have failed to allege that defendants had a duty to disclose any of the information they omitted.  Under Illinois law, a plaintiff must establish that a defendant had a "duty to inform [him] of any allegedly omitted material fact." *Lidecker v. Kendall College*, 550 N.E.2d 1121, 1124 (Ill. App. 1st Dist. 1990) (citing  *Zimmerman v. Northfield Real Estate, Inc*., 510 N.E.2d 409 (Ill. App. Ct. 1st Dist. 1986)).   Plaintiffs have not shown that defendants owed them a duty to disclose any of the information they claim defendants failed to disclose.  For the foregoing reasons, the Court **GRANTS** defendants' motions on plaintiffs' common law fraud claim.

### V.       Plaintiffs' Breach of Duty of Good Faith and Fair Dealing Claim

Judge Timberlake dismissed this Count with prejudice in his Order.  (Doc. 71 Ex. 1). Though plaintiffs included this Count in their amended complaint (Timberlake dismissed the other Counts without prejudice), they have abandoned it here, including it for purposes of a subsequent appeal only.  In any event, there is no good reason why Timberlake's determination on this issue should not stand here as the law of the case.  *See Voyles*, 751 N.E.2d at 1131; *Cramer v. Ins. Exch. Agency*, 675 N.E.2d 897 (Ill. 1996).   Therefore, the Court **DISMISSES** this claim.

### CONCLUSION

The Court **GRANTS IN PART AND DENIES IN PART** defendants' motions to dismiss (Doc. 13, 26) as follows:

The Court **GRANTS** defendants' motions with respect to plaintiffs' claims under the Illinois Insurance Code, and therefore **DISMISSES** Counts I and II;

The Court **DENIES** defendants' motions with respect to plaintiffs' claim for breach of

contract;

The Court **DENIES IN PART AND GRANTS IN PART** defendants' motions with respect to plaintiffs' CFA claims.  The Court **GRANTS** the motions to the extent they relate to plaintiffs' deception and UDTPA claims, and **DENIES** the motions to the extent they relate to plaintiffs' unfair conduct claim;

The Court **GRANTS** defendants' motions with respect to plaintiffs' claim for common law fraud, and therefore **DISMISSES** Count V; and

The Court **DISMISSES** Count VI.  The Court **DIRECTS the Clerk of Court** to enter judgment accordingly at the close of this case.

**IT IS SO ORDERED**

**Dated: July 11, 2006.**

         s/ J. Phil Gilbert       
**J. PHIL GILBERT**
**U.S. District Judge**